# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **SPINNER CONSULTING LLC,**<br>**Plaintiff,**<br><br>v.<br><br>**BANKRUPTCY MANAGEMENT**<br>**SOLUTIONS, INC.,**<br>**Defendant.** | No. 18-cv-12258-KM-MAH<br><br>**OPINION**<br>**(amended)** |

### KEVIN MCNULTY, U.S.D.J.:

This matter comes before the Court on the motion of the defendant Bankruptcy Management Solutions, Inc. ("BMS") to dismiss the complaint. (DE 16). Plaintiff Spinner Consulting LLC ("Spinner") alleges that BMS participated in a horizontal conspiracy with its competitors to fix the manner of charging fees for its bankruptcy software and services in violation of the Sherman Act, 15 U.S.C. § 1.

When a debtor files a Chapter 7 petition in bankruptcy, an estate containing the debtor's property is created and a trustee is appointed to administer the estate. BMS provides software and services to assist in the trustee's administration of the estate.

After the 2008 financial crash, BMS and its competitors successfully lobbied the Executive Office of the United States Trustee ("EOUST") to suspend the former rule that prohibited banks from charging a fee. Sometime after April of 2011, BMS implemented the payment structure at issue here: Its bankruptcy support and software services would be sold only in combination with banking services, and it would charge a set percentage of the funds in the estate's bank account for those combined services. BMS's competitors have set up their payment structures in the same manner.

On March 31, 2015, Robert Fusari filed a Chapter 7 petition for bankruptcy. On April 27, 2015, Alan E. Gamza (the "Trustee" or "Gamza") was appointed as the Fusari estate's trustee. On June 8, 2015, Gamza entered into a contract with BMS, under which Gamza agreed to deposit with Rabobank N.A. ("Rabobank") the funds of the Fusari estate. Gamza agreed to allow Rabobank to automatically withdraw a monthly fee from the estate. Rabobank deducted $15,627.98 in fees from the Fusari estate for combined banking and software services. After the bankruptcy case settled, Fusari executed an agreement with Spinner, under which Spinner acquired the residual property that had re-vested in Fusari after distributions to creditors.

On July 31, 2018, Spinner filed a one-count antitrust complaint against BMS. BMS filed a motion to dismiss the complaint, arguing that (1) Spinner is not a "direct purchaser" of its product or a proper party to bring this suit, and therefore lacks antitrust standing; (2) its lobbying efforts to EOUST are absolutely privileged under the *Noerr-Pennington* doctrine; (3) a release provision in the Bankruptcy Court's May 6, 2016 Order bars this action; and (4) Spinner has failed to state a claim under Federal Rule of Civil Procedure 12(b)(6).

For the reasons stated below, Spinner's motion to dismiss the complaint for lack of antitrust standing is granted. The direct-purchaser rule—concededly a somewhat arbitrary, policy-based rule—dooms the claims of Spinner, an indirect victim of the alleged antitrust injury to the trustee on behalf of the estate as purchaser of BMS's services.

I do not reach the other grounds for dismissal.

## I.    Facts[1]

### A. Bankruptcy Support Services

Upon the filing of a Chapter 7 bankruptcy petition, the Office of the United States Trustee, a division of the United States Department of Justice, appoints a trustee from the private sector to administer the estate. (Compl ¶11). The trustee is compensated by the estate and is responsible for collecting and liquidating the debtor's property. (Compl ¶¶11-12). The trustee is also required to submit reports regularly to the Bankruptcy Court. (Compl. ¶12). Trustees use software to help them meet those reporting obligations. (Compl. ¶13).

Since approximately 1987, BMS has provided bankruptcy support services. (Compl ¶13). BMS is the largest provider of bankruptcy support services, including software, in the United States. (Compl ¶4). BMS has more than a fifty percent share of "the number of Trustees in the United States." (Compl ¶20). Epiq eDiscovery Solutions, Inc. ("Epiq") is BMS's largest competitor, with a thirty percent share, and TrusteSolutions ("TES") is the second largest competitor of BMS, having a fifteen percent share. (Compl ¶¶5-6, 20). BMS developed the software that is used by bankruptcy trustees, and secured copyright protection over their software. (Compl ¶¶15-16). BMS's competitors have developed and maintained comparable software. (Compl ¶17).

Prior to the financial crisis in 2008, trustees had received software services directly from the bank that held the estate's assets. (Compl ¶¶14, 25). BMS therefore did not directly charge the estate for its services. (Compl ¶25).

---

[1]    As required at this stage, the Court accepts the factual allegations in the complaint as true. For ease of reference, certain items from the record will be abbreviated throughout this Opinion as follows:

DE = Docket entry number in this case;

Compl = Spinner's complaint (DE 1);

DBr = Defendant BMS's brief in support of its motion to dismiss (DE 16);

PBr = Spinner's opposition brief (DE 22);

DRBr = BMS's reply brief (DE 24).

Instead of a direct charge, BMS "would direct the Estate to deposit its fund in a selected bank." (Compl ¶25). BMS required the trustees who used its services to deposit the funds of the estates at "a partner bank of BMS." (Compl ¶20). Before November of 2012, BMS required trustees to deposits funds at the Bank of New York Mellon. (Compl ¶21).

After the funds of the estate were deposited into BMS's selected bank, the bank would "earn money from these deposits" and would pay a fee to the bankruptcy software provider. (Compl ¶25).[2] The bank paid this fee through a reduction in the estate's interest income, in essence, by providing a lower rate of interest on Chapter 7 estate deposits as compared to commercial clients. (Compl, ¶36, Ex. A at 2). This allowed the bank to earn money from the deposit, and the bank would then pay a fee to BMS as well as interest to the estate. (*Id.*). It appears that the process was set up in this manner, instead of a direct charge because, at the time, the U.S. Trustees' rules governing Chapter 7 bankruptcy accounts prohibited banks from charging a fee for their services. (Compl ¶34).[3]

After the financial crisis in 2008, interest rates declined, and consequently, "the amount of money that the bank could earn from the deposits of Estates also declined, as did the bank's ability to pay BMS a fee." (Compl ¶26). Chapter 7 accounts were no longer profitable for banks, who responded by reducing interest rates and initial "collateral and administrative charges," and discouraging trustee deposits. (Compl, Ex. A, at 1). One major bank responded by ceasing its participation in the Chapter 7 program entirely. (*Id.* at 2).

In response, BMS, Epiq, and TES requested that the U.S. Trustee suspend the rule that prohibited banks from charging a fee in order to allow trustees to pay bank fees from estate accounts. (Compl ¶35). BMS recognized

---

[2]     BMS started as a "spin-off off of a bank that had previously provided free bankruptcy software to Trustees." (Compl ¶14).

[3]     It is not clear from the complaint whether there was similar rule in place at the time that barred bankruptcy support services from directly charging the estate.

that the goal of any proposed solution should take into account certain "conditions," including that the crisis was temporary, that banks should receive adequate compensation so that they remained active participants in Chapter 7 programs, and that any solution should continue "the historical process of allocating the cost of the services to the estates that are the beneficiaries of those services." (Compl, Ex. A).

On or about November 26, 2010, BMS submitted a letter to the Executive Offices of the U.S. Trustee, noting the following:

> In several conversations with various participant banks, a number of options have been discussed. Satisfying all of the conditions presented above, however, left a single structural option. Although the numbers vary slightly for each bank, the structure is constant with two key components:
>
> First, since estates do not currently pay for services (banking and software) through a reduction in their interest income, have them continue to pay for these services via a service fee, as a of average deposit balance assessed monthly on each account.
>
> Second, while there would be a base service fee percentage the actual percentage applied would vary reflecting changes, hopefully improvements, in the interest rate market by being tied to the Effective Federal Funds rate. As the Effective Federal Funds Rate increases, the service fee would be reduced, eventually disappearing as bank interest rates increase.

(Compl ¶36). BMS proposed that a monthly fee be "applied evenly" to all Chapter 7 accounts. (Compl., Ex. A, at 3). Based on its "conversations with the banks and independent research regarding bank costs and profitability targets," BMS "believed that a rate as low as 3% with the fee adjustment reflecting the actual [Effective Federal Funds rate (EFF)] may be adequate to attract the banks to continue their full participation to include the funding of the software providers." (Compl, Ex. A at 4).[4]

---

[4]     Prior to submitting this letter, Spinner alleges that BMS considered selling its software by directly charging estates a fee on either a (1) per trustee basis; (2) per case basis, or (3) per transaction basis. (Compl ¶¶27-28). Spinner claims that BMS preferred the model of charging estates for combined software and banking services

Sometime after BMS drafted this letter, Epiq received and reviewed it, and provided its own comments to the U.S. Trustee on January 18, 2011. (Compl ¶¶37-38, 76 Ex. B). In preparing its comments, Epiq reviewed the remarks that had been "submitted previously by other market participants and solicited input from all financial institutions with which Epiq Systems has relationships in the Chapter 7 environment." (Compl, Ex. B). With respect to BMS's proposal, Epiq indicated that the proposed "structure would promote future stability for trustees' activities," and "would be accessed uniformly to all estate accounts." (Compl ¶37, Ex. B). On or about January 21, 2011, TES requested that the U.S. Trustee allow this fee. (Compl ¶¶ 39, 77).

Spinner alleges that the November 26, 2010 BMS document is evidence of a conspiracy because it demonstrates that "BMS had conversations with various banks participating in the Chapter 7 program, which necessarily included the partner banks of BMS's horizontal competitors" and "BMS reached an agreement with at least one of those banks, and therefore one of BMS's horizontal competitors, to fix the manner of selling and charging for combined bankruptcy support services and bankruptcy banking services." (Compl ¶74).

Spinner further alleges that "upon information and belief," BMS, Epiq, and TES "communicated directly about selling bankruptcy support services only in combination with bankruptcy banking services" sometime before the November 26, 2010 BMS document, and have since been in regular communication. (Compl ¶¶ 72, 82).[5]

---

based on a percentage of the money in the bank account of the estate because it "would not allow Estates to determine the extent to which BMS, as opposed to its partner bank, received a fee." (Compl ¶30).

[5]     To support its allegation that the three companies have been in regular contact and communication, Spinner alleges that representatives from the three companies have attended bankruptcy law conferences, which provided the companies an opportunity "to meet with each other and discuss, coordinate and otherwise advance the conspiracy among them." (Compl ¶¶83-85). Spinner has also pulled a portion of court transcript from *In re Bradley & Michelle Dorfler, et al.*, No. 10-51411 (MSS) (N.D.

On or about January 21, 2011, Texas Capital Bank, on its and TES's behalf, proposed to the U.S. Trustee "that Estates be charged for combined bankruptcy support services" and "banking services based upon a percentage of the amount of money in the Estate." (Compl ¶78). Texas Capital bank stated the following:

> Due to the current interest rate environment financial institutions are able to secure deposits at virtually no operational cost. The current UST program requires a high level of operational support, including banking support, software support and hardware support to bankruptcy trustees to remain in compliance with the UST requirements to administer bankruptcy estates that cannot be offset solely by the value of deposits maintained. Therefore TCB will need to assess to the bankruptcy estates a monthly Custodial Fee as a percentage of balances maintained to offset the operational support provided. Depending on the level of operational support required and the interest rate environment TCB will annually adjust the Custodial Fee accordingly.

(Compl ¶78 (emphasis omitted)). Spinner alleges, "upon information and belief," that Texas Capital Bank communicated this information "to BMS and Epiq, either directly or indirectly." (Compl ¶79).

On or about April 29, 2011, the U.S. Trustee agreed to suspend the rule that prohibited trustees from paying bank service fees from estate accounts. (Compl ¶40). It appears that even though the rule was suspended, the U.S. Trustee did not specify how the fee should be calculated, assessed, or paid.

Spinner alleges that after this rule was suspended, BMS, Epiq, and TES, "upon information and belief, reaffirmed their conspiracy to sell Estates

---

Ohio), where the following exchange occurred between the court and a representative of BMS, Steve Coffey, in the presence of an Epiq representative, Schott Field:

> THE COURT: Okay. Mr. Coffey, you heard me – I'll make sure your counsel doesn't mind my asking you questions directly. You know, if I'm asking – if I start to veer into any trade secrets or confidential information, then simply say so.

> MR. COFFEY: I don't think there will be a problem. Mr. Field is in the room and I don't think we had a lot of secrets between us so that's fine.

(Compl ¶86).

bankruptcy services only in combination with bankruptcy banking services, and to charge no fee to an Estate for those combined services other than a percentage of the amount in the bank account of the Estate." (Compl ¶¶ 41-42).

Sometime after April 29, 2011, BMS and "its partner bank entered into agreements with Trustees that required their Estates to pay a combined fee for bankruptcy support services and bankruptcy banking services" based on "a percentage of the money in the account of the Estate." (Compl ¶43). BMS and its partner bank "then began deducting as a fee for those combined services a percentage of the money" in the estates' accounts. (Compl ¶44). BMS "continues to sell bankruptcy support services only in combination with bankruptcy banking services, and to charge Estates no fee for those combined services other than a percentage of the amount in the bank account of the Estate." (Compl ¶46). Since 2012, BMS has used Rabobank as its "partner bank," and has required trustees to deposit the funds of the estate there. (Compl ¶7).[6]

Neither BMS, Epiq, nor TES has charged a fee for bankruptcy support services "(a) on a per trustee basis, (b) on a per case basis, or (c) on a per transaction basis." (Compl ¶45). At the time the complaint in this action was filed, BMS and Rabobank charged fees at the annual rate of 1.75 percent "of the amount on deposit at Rabobank." (Compl ¶47). Epiq "and its partner banks charge" a 1.75 percent fee on the amount on deposit, and TES and "its partner banks charge fees at the annual rate of 1.9 percent of the amount on deposit at those banks." (Compl ¶47).[7]

---

[6]    Rabobank currently holds about two billion dollars in deposits from trustees who contract with BMS. (Compl ¶24).

[7]    As noted by BMS, the complaint does not allege that the partner banks were part of this conspiracy, or that BMS, Epiq, TES agreed on a certain percentage. (DBr at 5). BMS also asserts that the complaint also does not allege "the date on which the parties would switch" to this percent-based fee model, "the estate-size threshold above which the percentage rate would kick in, or the estate-size at which the percentage-based fee would be capped." (DBr at 5 (citing Compl ¶¶41-47)).

In June of 2011, BMS stated in a "publicly distributed" document that the service fee was not negotiable, "[i]n order to provide equal treatment in all bankruptcy cases." (Compl ¶91). The "document" further stated that "the Service Fee is based on a uniform rate as set forth above and is a condition of participation in the BMS program." (Compl ¶91).

Spinner claims that since late 2011, BMS, Epiq, and TES have "refused to negotiate fees with Trustees." (Compl ¶92). In a declaration submitted by Coffey of BMS in *In re Nanodynamics, Inc.*, No. 09-13438 (MJK) (W.D.N.Y.), dated September 12, 2011, Coffey addressed the issue of the fee in response to the Court's concerns regarding the pricing for BMS's services. (Compl ¶94).[8]

The Court expressed concern "that the business model, pricing, . . . [was] not based on monthly activity [or] on the burdens upon the service providers, [but was] based simply upon how many dollars are in an account." (Compl ¶94 (alterations added)). In response, Coffey certified that:

> 21. The Court's observation is essentially correct, but that should not affect the allowance of the BMS Service Fee as an administrative expense, for at least three reasons. . . . Where, as here, the trustee in the exercise of his discretion has determined that the foregoing requirements are satisfied, I am not aware of anything that requires that a claim be measured by any particular method, such as the (a) cost to the provider of providing the service; (b) the amount of the service actually used by the estate each day; or (c) the price at which a competitor might be willing to offer a similar product, albeit with a lower quality of service. If it were otherwise, then administrative expenses for things like a trustee's compensation under section 326(a), the UST's quarterly fees, or even the rent paid by a trustee for a facility to store estate property, would all be subject to retrospective revaluation on an individual case basis. I would submit that under such a regime, few, if any, parties would be willing to do business with a chapter 7 trustee; BMS and BNY Mellon certainly would not.
>
> 22. Second, the BMS 'flat' percentage fee structure exists for a reason, much like the rate structures for trustee compensation, UST quarterly fees, and, say monthly premises rent, are 'flat fee' based, rather than being based [on] use or activity levels. The

---

8       Spinner has only provided the above-quoted snippets of the court transcripts.

reason is that no other structure is administratively feasible. BMS and BNY Mellon do business with hundreds of trustees across the nation, who collectively handle more than 50,000 'asset' cases currently (in addition to hundreds of thousands of 'no asset' cases annually), it would be utterly impractical for BMS and BNY Mellon to negotiate hundreds, or thousands, of 'one-off deals' with individual trustees, based on the facts and circumstances of each case; the costs of evaluating, negotiating and monitoring so many unique contracts would by themselves be prohibitive, to both the trustees and to BMS and BNY Mellon. While the trustee services business may, if this interest rate environment continues, ultimately evolve to a different model, where pricing is based on a set schedule of fees and charges for numbers and types of transactions, at this point, that is simply not a business model that BMS and BNY Mellon are prepared to offer. When and if any other providers are willing to offer services under such a model, trustees of course have the ability to terminate their arrangements with BMS and BNY Mellon on 30 days notice, and to contract with such providers, to the extent that the trustees believe that they should do so in accordance with the exercise of their fiduciary duties.

(Compl ¶94).

Spinner's complaint includes allegations of "circumstantial evidence" of the alleged conspiracy. (Compl ¶¶ 80-102). On Epiq's Form 10K, filed on February 25, 2011 with Securities and Exchange Commission (before the U.S. Trustee agreed to suspend the rule), Epiq represented that it does not compete "in the market for bankruptcy support services based upon price." (Compl ¶¶87-90). Jill Bauer, the Managing Director of Trustee and Fiduciary Services for Epiq, executed a declaration on January 12, 2016, confirming that bankruptcy support service providers competed only in terms of market share, and not in terms of price. (Compl ¶95).

Spinner also alleges that Bankruptcy Courts have questioned whether trustees "should pay combined fees for bankruptcy support services and bankruptcy banking services from Estate accounts." (Compl ¶90; see Compl ¶98 (citing In re Canopy, no. 09-44943 (ERW) (Bankr. N.D. Ill.))). Spinner points to the following exchange between a Bankruptcy Court in the Northern District of Illinois and a trustee:

MR. PALOIAN: And so what we face now are the bundled services of Epic plus a bank.

THE COURT: Okay. I think what we need is to unbundle it.

MR. PALOIAN: Yeah, exactly, Judge. I couldn't agree more. I've tried to do this. I've had these discussions. We're not necessarily at the point. I have not been able to get a direct quote for just trustee/Epic [sic] software services.

(Compl ¶98 (alteration in original)).

In terms of the amount charged by the software companies, Spinner asserts that it is excessive, and that trustees have written complaints about the amount charged to the National Association of Bankruptcy Trustees. (Compl ¶¶ 100-01). Additionally, in a memorandum from Epiq to the Administrative Office of the U.S. Courts dated April 2, 2012, an Epiq representative advised that "Banks will not enter into this business and wait for an order in the future authorizing the fee on a case-by-case basis or possibly risk disgorgement should a court determine them unreasonable." (Compl ¶102). However, the Epiq representative also noted that "This does not mean that the judiciary needs to authorize the fees presently being charged by banks. The courts could authorize some smaller number they feel is 'reasonable' (such as 0.50% to 0.75%) and then allow a bank to request a higher amount for unique situations." (Id.).

### B. Fusari Bankruptcy Petition

On or about March 31, 2015, Robert Fusari filed a petition for bankruptcy under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey. (Compl ¶¶ 8, 48). As a result of that filing, an estate was created, comprised Fusari's property at the time of the filing of the petition. (Compl ¶10).

After the U.S. Trustee appointed a Chapter 7 trustee for the estate, on or about April 27, 2015, the creditors of the Fusari estate elected Alan E. Gamza Trustee ("Gamza") to replace the appointed Chapter 7 trustee. (Compl ¶49).

On or about June 8, 2015, Gamza entered into a contract with BMS, and agreed to deposit with Rabobank all, or substantially all, of the funds of any estate for which he used BMS's bankruptcy support services. (Compl ¶¶50-51). Gamza also agreed with BMS to allow Rabobank to automatically withdraw a monthly fee from the estate, "without any approval of the Bankruptcy Court or notice to the creditors." (Compl ¶51). On that same date, Gamza entered into a separate contract with Rabobank that authorized Rabobank to automatically withdraw the monthly fee from the estate accounts, without seeking approval from the Bankruptcy Court of providing notice to the creditors. (Compl ¶¶52-53).

From April 27, 2015, through October 20, 2015, Gamza deposited the funds from the Fusari estate into an account at Rabobank. (Compl ¶54). Rabobank deducted $15,627.98 from the Fusari estate as a fee. (Compl ¶¶55, 57). Spinner alleges that Rabobank paid this fee to BMS and that the "amount Rabobank deducted in fees . . . was greater than the amount of the fees that would have resulted in the absence of a conspiracy involving BMS to fix the manner of charging Estates a combined fee for bankruptcy support services and bankruptcy banking services." (Compl ¶58).

On May 6, 2016, the Fusari case settled. (Compl ¶62). The Bankruptcy Court entered an order on that date, incorporating the terms of the settlement. That May 6, 2016 Order required that the residual property of the Fusari estate be re-vested in Fusari. (Compl ¶¶8, 63).[9] In particular, paragraph 16 of the Order provided as follows:

> 16. Revesting of Property in Debtor. Upon dismissal of the Bankruptcy Case, all property of the Debtor's estate and of the Entities remaining after payment of the amounts set forth above wherever located shall revest in the Debtor without further Order of the Court.

---

[9]     BMS attached the May 6, 2016 order, which is referenced in the complaint, as an exhibit to its motion to dismiss. (DE 17-2, Ex. B).

(Compl ¶63).[10]

All payments under the order were made on or before June 1, 2018. (Compl ¶66). Thereafter, on July 27, 2018, Fusari executed an agreement with Spinner, and Spinner acquired the property that had vested in Fusari. (Compl ¶¶ 9, 67). Spinner alleges that the property that it acquired from Fusari "includes the claim asserted in this action." (Compl ¶67). Spinner also claims that "as successor to Fusari," it has "sustained an injury in fact" that was caused by the "overcharge." (Compl ¶104).

### C. Procedural History

On July 31, 2018, Spinner filed a complaint against BMS in this Court, alleging that BMS, Epiq, and TES conspired to sell bankruptcy support services "only in combination with bankruptcy banking services, and to charge Estates no fee for those combined services other than a percentage of the amount in the bank account of the Estate," in violation of the Sherman Act, 15 U.S.C. § 1.

---

[10]    The May 6, 2016 Order also included a release:

*Upon the payment in full of the Initial Settlement Payments identified above to the applicable Parties*, the estate and the Debtor on his own behalf and on behalf of his Entities, heirs, executors, administrators, agents, representatives, *successors and assigns*, and on behalf of any and all heirs and assigns release, *acquit and forever discharge the Parties*, the Creditors and the Parties-in-Interest identified above (including Gaines and Lowenstein) *and their present and former* officers, directors, parents, subsidiaries, affiliated companies, employees, *independent contractors, agents*, representatives, and attorneys, and their respective heirs, executors, administrators, agents, representatives, successors and assigns of and *from any and all debts, suits, claims*, judgments, actions, causes of action, demands, rights, damages, expenses, costs, attorneys' fees, and compensation whatsoever, *known or unknown, foreseen and unforeseen, that the Debtor or any of the Entities has, had or may have, arising from facts, events, circumstances, actions or omissions from the beginning of time until the Effective Date of this Settlement Agreement*, including without limitation all claims and causes of action that were raised or could have been raised in this Bankruptcy Case or relating to the Bankruptcy Case.

(DE 17-2, Ex. B, at ¶5(c)). The order is binding on all the parties, "and their successors and assigns." (DE 17-2, Ex. B, at ¶32).

(Compl ¶69). The complaint alleges individual and class claims. (Compl ¶¶113-120).

On October 1, 2018, BMS filed a motion to dismiss the complaint, arguing that (1) Spinner lacks antitrust standing because it is not the "direct purchaser" of BMS's software and support services; (2) BMS's efforts to lobby for regulatory change are absolutely privileged; (3) the release provision in the May 6, 2016 order bars Spinner's claim; and (4) Spinner has failed to plead sufficient facts to state a claim. (DE 16). Spinner has filed papers in opposition to BMS's motion. (DE 22).

## II.    Standard

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (Rule 8 "requires a 'showing' rather than a blanket assertion of an entitlement to relief." (citation omitted)). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Twombly*, 550 U.S. at 570; *see also West Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 169 (3d Cir. 2013).

That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id.*

Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Sci.*

*Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

When deciding a motion to dismiss, a court typically does not consider matters outside the pleadings. However, a court may consider documents that are "integral to or explicitly relied upon in the complaint" or any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999) (emphasis and citations omitted); *see In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 n.7 (3d Cir. 2016); *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

Reliance on these types of documents does not convert a motion to dismiss into a motion for summary judgment. "When a complaint relies on a document . . . the plaintiff obviously is on notice of the contents the document, and the need for a chance to refute evidence is greatly diminished." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196-97 (3d Cir. 1993).

"While 'there is no heightened pleading standard in antitrust cases, and the general principles governing Rule 12(b)(6) motions apply,' an antitrust plaintiff must 'plead his complaint with particularity; a complaint, or counterclaim containing only conclusory recitations of law is insufficient to survive a motion to dismiss.'" *Animal Sci. Prods.*, 34 F. Supp. 3d at 484 (quoting *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 529 (D.N.J. 2004)). An antitrust plaintiff must do more than make "allegations of consequential harm resulting from a violation of the antitrust laws," and that is true even when the complaint is "buttressed by an allegation of intent to harm." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC")*, 459 U.S. 519, 545, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983).

Even when a complaint makes these allegations, it may not proceed when "[o]ther relevant factors — the nature of the [claimant's] injury, the tenuous and speculative character of the relationship between the alleged antitrust violation and the [claimant's] alleged injury, the potential for duplicative recovery or complex apportionment of damages, and the existence of more direct victims of the alleged conspiracy — weigh heavily against judicial enforcement." *Id.*; *see Twombly*, 550 U.S. at 557-58 ("[S]omething beyond the mere possibility of [relief] must be alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." (internal quotation marks omitted)).

An issue presented in this motion is antitrust standing. Article III standing and antitrust standing are "distinct" concepts. *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 269-70 (3d Cir. 2016). "Unlike Article III standing, statutory standing is not jurisdictional." *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 320 (3d Cir. 2015) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388, 188 L. Ed. 2d 392 & n.4 (2014)).

Thus, dismissal for lack of statutory standing is properly addressed as a matter of sufficiency of pleading under Rule 12(b)(6), rather than under Rule 12(b)(1). *See id.*; *see also NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449 (6th Cir. 2007) ("antitrust standing and Article III standing are not one and the same, and we not only may — but we must — reject claims under Rule 12(b)(6) when antitrust standing is missing.").

### III.   Discussion

BMS argues that Spinner lacks antitrust standing because it is not a "direct purchaser" of its software (and services, presumably). (DBr at 7-13 (citing *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S. Ct. 2061 (1977)). Relatedly, BMS argues that Spinner is not a "proper party," or the most effective plaintiff from among those who have suffered the alleged antitrust

injury. *See AGC,* 459 U.S. at 537-38; *see also Ethypharm S.A. France v. Abbott Labs.,* 707 F.3d 223, 232-33 (3d Cir. 2013).

### i. *The Sherman Act and Antitrust Standing*

The Sherman Act declares that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations . . . to be illegal." 15 U.S.C. § 1. To state a claim, a plaintiff must establish four elements: "(1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy." *Animal Sci. Prods.,* 34 F. Supp. 3d at 480 (citation and internal quotations omitted).

"While the rule of reason typically mandates an elaborate inquiry into the reasonableness of a challenged business practice, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable." *Id.* at 481 (quotations and citation omitted). The types of "agreements or practices" that lack "any redeeming virtue" and are therefore "presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use . . . are price fixing, division of markets, group boycotts, and tying arrangements." *Id.* (quotation and citation omitted); *see also Deutscher Tennis Bund v. ATP Tour, Inc.,* 610 F.3d 820, 830 (3d Cir. 2010) ("Some categories of restraints, such as horizontal price-fixing and market allocation agreements among competitors, 'because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable.'" (citation omitted)).

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides a private right of action to "*any* person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." (emphasis added). The

broad language of § 4 reflects Congress' intent to "create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 472, 102 S. Ct. 2540, 73 L. Ed. 2d 149 (1982). Although the statutory language is broad, courts have developed a number of related doctrines that limit which parties may assert claims for damages. *Id.* at 473. In general, these doctrines seek to place antitrust claims in the hands of the most efficient enforcer of the antitrust laws. *Animal Sci. Prods.*, 34 F. Supp. 3d at 491.

"The term 'standing' as used in the antitrust context is conceptually difficult and has not been delineated with precision." *In re Processed Egg Prods. Antitrust Litig.*, 881 F.3d 262, 268 (3d Cir. 2018) (citing *AGC*, 459 U.S. at 536 ("There is a similarity between the struggle of common-law judges to articulate a precise definition of the concept of 'proximate cause,' and the struggle of federal judges to articulate a precise test to determine whether a party injured by an antitrust violation may recover treble damages.")). Antitrust standing requires more than the familiar three-part test for Article III standing (injury in fact, causation, and redressability). *Id.*

Antitrust standing "requires a plaintiff to 'prove more than injury causally linked to an illegal presence in the market.'" *Id.* (quoting *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 263 (3d Cir. 2016)). The Supreme Court has observed that an "antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy." *McCready*, 457 U.S. at 476-77. Nonetheless, "[i]t is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." *Id.* at 477; *see Cromar Co. v. Nuclear Materials & Equip. Corp.*, 543 F.2d 501, 505 (3d Cir. 1976) (noting that treble damages should be "confine[d] . . . to those individuals whose protection is the fundamental purpose of the antitrust laws.").

Therefore, "the courts have sought to narrow the scope of the remedy provided by § 4 by limiting the class of persons who have standing to sue under that statute." *Bravman v. Bassett Furniture Indus., Inc.*, 552 F.2d 90, 96 (3d Cir. 1977). The Supreme Court has "articulated several factors to consider when analyzing whether a plaintiff has such standing." *LifeWatch Servs. v. Highmark Inc.*, 902 F.3d 323, 341 (3d Cir. 2018) (citing *AGC*, 459 U.S. at 538). Based on the Supreme Court's opinion in *AGC*, the Third Circuit has summarized those factors as follows:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Id.* at 341-43 (quoting *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3d Cir. 1993)).

Merely derivative injuries sustained by employees, officers, stockholders, and creditors of an injured company do not constitute "antitrust injury" sufficient to confer antitrust standing. *Pitchford v. PEPI, Inc.*, 531 F.2d 92, 97 (3d Cir. 1975) (holding that indirect harm that individual stockholder suffered may not to be redressed through injury inflicted upon the corporation), *cert. denied*, 426 U.S. 935, 96 S. Ct. 2649, 49 L. Ed. 2d 387 (1976); *Loeb v. Eastman Kodak Co.*, 183 F. 704 (3d Cir. 1910) (holding that injury to corporation, even if caused by Sherman Act violation, is a claim belonging to the corporation, and not to its stockholders or creditors); *see Lovett v. General Motors Corp.*, 975 F.2d 518, 521 (8th Cir. 1992) (denying antitrust standing to sole shareholder where only alleged injury stemmed from failure of corporation caused by antitrust violation), *cert. denied*, 127 L. Ed. 2d 378, 114 S. Ct. 1058 (1994); *see*

*also Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Assoc.*, 830
F.2d 1374, 1378 (7th Cir. 1987).

### ii. Direct Purchaser Rule

A second, closely related doctrine that affects which parties can sue for
antitrust damages is the direct-purchaser rule. "The *Illinois Brick* direct
purchaser rule limits the scope of liability by choosing the most suitable
plaintiff from among the purchasers potentially harmed by cartel pricing."
*Animal Sci. Prods.*, 34 F. Supp. 3d at 492. Pursuant to *Illinois Brick*, 431 U.S.
720, there is a "general rule that only direct purchasers from antitrust violators
may recover damages in antitrust suits." *Howard Hess Dental Labs., Inc, v.
Dentsply Intern., Inc. ("Hess I")*, 424 F.3d 363, 369 (3d Cir. 2005); *see Apple Inc.
v. Pepper*, 139 S. Ct. 1514, 1520 (2019) ("we have consistently stated that 'the
immediate buyers from the alleged antitrust violators' may maintain a suit
against the antitrust violators."); *see also McCarthy v. Recordex Serv., Inc.*, 80
F.3d 842, 847-48 (3d Cir. 1996) ("[T]he [*Illinois Brick*] Court . . . enunciat[ed] a
bright-line rule that only the purchaser immediately downstream from the
alleged monopolist may bring an antitrust action.").[11]

On the other hand, "*indirect* purchasers who are two or more steps
removed from the violator in a distribution chain may not sue." *Apple Inc.*, 139
S. Ct. at 1520. Therefore, this private right of action does not extend to indirect
purchasers. Only overcharged direct purchasers, and not others in the chain of
manufacture or distribution, are parties "injured in [their] business or

---

[11]     The direct purchaser rule was first considered by the Supreme Court in
*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 88 S. Ct. 2224, 20 L. Ed.
2d 1231 (1968). In that case, a shoe manufacturer sued another manufacturer and
distributor of shoe machinery, alleging that the manufacturer had monopolized the
shoe industry. 392 U.S. at 483-84. The defendant argued that the plaintiff lacked
standing to sue because the plaintiff had effectively "passed on" any injury to its
customers. *Id.* at 488 n.6. The Supreme Court rejected that defense, finding that only
the "direct purchaser" of an illegally overcharged good, and not others in the chain of
manufacturing or distribution, is the party "injured" within the meaning of § 4. *Id.* at
489-91.

property" within the meaning of the Act. *Illinois Brick*, 431 U.S. at 729.[12] As is the case with bright-line rules, the direct-purchaser rule means that there is no reason to ask whether the rationales of *Illinois Brick* "apply with equal force" in every individual case. *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 216, 110 S. Ct. 2807, 111 L. Ed. 2d 169 (1990). The Court does not engage in "an unwarranted and counterproductive exercise to litigate a series of exceptions." *Id.* at 217. The rule, by design, is somewhat rigid and arbitrary.

In *Illinois Brick*, the defendant was a brick manufacturer and distributor, who sold bricks to contractors who, in turn, submitted bids to general contractors. 431 U.S. at 726. These general contractors then created and submitted bids to final consumers, like the State of Illinois. *Id.* The State of Illinois, representing a number of customers, sued the original manufacturer, alleging that the brick manufacturer had engaged in an illegal price-fixing conspiracy. *Id.* at 726-27. The Supreme Court held that Illinois, which purchased the bricks following "two separate levels in the chain of distribution," *id.* at 726, was an indirect purchaser without standing. *Id.* at 735.

---

[12]     The direct purchaser rule seeks "to avoid the complications that would flow from allowing suits by indirect purchasers." *Wallach v. Eaton Corp.*, 837 F.3d 356, 365 (3d Cir. 2016). Such complications include "(1) the difficulty courts (and litigants) would have in parsing how much of the harm caused by supracompetitive prices charged by an antitrust violator was incurred by the direct purchaser as opposed to being passed down to indirect purchasers;" "(2) the possibility that multiple lawsuits could result in inconsistent adjudications of liability or could result in an antitrust violator paying more than the injury it actually inflicted once both direct and indirect purchasers obtained recovery;" and "(3) the deleterious effect that the combination of uncertainty around damages and the likelihood that each individual indirect purchaser's share of damages would be small would have on the incentive for private parties to initiate suits." *Id.*

Balancing these concerns, the Supreme Court concluded that more effective enforcement of antitrust laws would be achieved by allowing antitrust suits only to be filed by direct purchasers. *Illinois Brick*, 431 U.S. at 734.

Since *Illinois Brick*, the Supreme Court has reaffirmed the "bright line" quality of the direct purchaser rule. *See UtiliCorp*, 497 U.S. at 213-14;[13] *see also McCarthy*, 80 F.3d at 848 (interpreting *UtiliCorp*, *Illinois Brick*, and *Hanover Shoe* as "enunciating a bright-line rule that only a purchaser immediately downstream from the alleged monopolist may bring an antitrust action.").

"When determining whether a plaintiff and defendant are involved in a direct purchaser/seller relationship, courts look to the 'economic substance of the transaction,' rather than the physical attributes of the transaction or the geographical movement of goods and services." *Animal Sci. Prods.*, 34 F. Supp. 3d at 500 (citing *Hess I*, 424 F.3d at 373 (finding that plaintiffs-purchasers did not become direct purchasers from a manufacturer who drop-shipped products to them because "the dealers still make the sale to [the] Plaintiffs and [the] manufacturer] makes the sale to the dealers.")); *see also Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77 (3d Cir. 2011).

---

13    In *UtiliCorp*, several public utilities sued a pipeline company and natural gas producers, alleging that the defendants conspired to inflate the price of the natural gas supplied to public utilities. 497 U.S. at 204-05. This fuel was bought by a utility and the entire cost was passed on to consumers. *Id.* The states of Kansas and Missouri, acting as *parens patriae*, asserted the same claims on behalf of all persons residing in those states who purchased the gas. *Id.* at 204. The defendants argued that the utility companies (the direct purchasers of the gas) lacked standing to bring suit because state and municipal regulations ensured that the utility companies had "passed on" the alleged overcharge to their customers. *Id.* at 205. The states argued that the residential customers should have standing to bring suit because the customers bore the full cost of the price-fixing conspiracy. *Id.* at 208.

The Supreme Court acknowledged that "the rationales of *Hanover Shoe* and *Illinois Brick* may not apply with equal force in all instances" but held that it was "inconsistent with precedent and imprudent in any event to create an exception for regulated public utilities." *Id.* The Court rejected Kansas's claim, explaining that the consumers were "not the immediate buyers from the alleged antitrust violators" and, instead, they "bought their gas from the utilities, not from the suppliers said to have conspired to fix the price of gas." *Id.* at 207. Essentially, it was the utility that had the right to sue the suppliers for antitrust violations and allowing the utility's customers to also sue the suppliers would risk multiple recoveries and create difficult apportionment problems. *Id.* at 207, 212.

Recently, the Court of Appeals in *Warren*, 643 F.3d at 79, 88, reaffirmed the importance of considering "the mechanics of the transactions" at issue to determine who is the direct purchaser. There, a pharmaceutical manufacturer would sell its products to wholesalers, who in turn would resell those products to the member hospitals. The Court affirmed the district court's decision that the hospital-plaintiff lacked standing to assert a claim against the pharmaceutical manufacturer.

In particular, the Court noted the following qualities of the transaction: (1) the hospital places an order through the wholesaler; (2) the wholesaler negotiates the final sales price of the products separately with the hospital; (3) the hospital physically takes delivery of the shipment from the wholesaler; and (4) the hospital pays the wholesaler directly, and does not transmit funds to the manufacturer. *Id.* at 88. Thus, the hospital's purchases "go through at least one other stage in the chain of distribution" before reaching the hospital, and the hospital was thus an indirect purchaser that lacked standing. *Id.*; *see also In re Hypodermic Prods. Antitrust Litig.*, 484 F. App'x 669, 675 (3d Cir. 2012).[14]

A similar action has been brought against BMS in the Northern District of Illinois that alleged a horizontal price-fixing conspiracy based on the same operative facts and among the same software providers, BMS, Epiq, and TES. *See McGarry & McGarry, LLP v. Bankr. Mgmt. Sols., Inc.*, 2017 U.S. Dist. LEXIS

---

[14]     The Third Circuit in *In re Hypodermic Prods. Antitrust Litig.*, 484 F. App'x at 675, essentially recognized the same factors. In that case, plaintiffs were the distributors of defendant's hypodermic products and certain healthcare providers that purchased defendant's products. *Id.* at 670-71. In concluding that the healthcare providers, unlike the distributors, were not the direct purchasers, the Court noted that:

> (1) when Healthcare Providers needed hypodermic products, they placed orders through Distributors; (2) Distributors negotiated the final sales price of the hypodermic products separately with the Healthcare Providers; (3) Distributors physically shipped the products to Healthcare Providers; and (4) Healthcare Providers paid Distributors directly and did not transmit funds to [defendants].

*Id.* at 675 (alteration added).

93133, *1-4 (N.D. Ill. June 16, 2017).[15] In *McGarry*, the trustee entered into a contract with BMS, but the estate paid for the services. 2017 U.S. Dist. LEXIS 93133, at *6 n.7. The creditor-plaintiff argued that the estate was the "direct" purchaser of the bankruptcy software because "the estate paid for the services." *Id.* BMS argued, as it does in this case, that the trustee or the bank was the "direct purchaser." The court did not expressly decide which entity was the direct purchaser of the bankruptcy software. It concluded, however, that *if* the estate was the direct purchaser, then it "owned any antitrust claim and was entitled to one hundred percent of any overcharge." To allow the creditor to bring an antitrust claim, the court held, could subject BMS "to multiple liability." *Id.* at *6.

The court further noted that "the estate was injured by the overcharge: it had less in assets than before." To the extent that the estate was solvent after satisfying creditors, the remaining assets would be returned to the debtor. *Id.* at *8. "If BMS overcharged a solvent estate, fewer assets would return to the debtor." *Id.* In passing, the court also noted that 11 U.S.C. § 350 permits any interested party to move to reopen an estate, and that "a debtor may petition to reopen an estate specifically to investigate a potential antitrust claim." *Id.* at *7 (citing *In re Indus. Marine Diesel, Inc.*, 1997 WL 33474937, at *4 (Bankr. S.D. Ga. Jan. 31, 1997) (granting debtor's motion to reopen an estate to allow debtor to pursue an antitrust claim that was based on facts discovered after the bankruptcy case had closed)). Additionally, the court pointed out, "as a trustee in bankruptcy owes a fiduciary duty to an estate's creditors, . . . the trustee could 'pursue the debtor's claim against the defendant on behalf of all the debtor's creditors equally, without preference for any particular creditor." *Id.* at *9; *see also McGarry & McGarry LLP v. Bankr. Mgmt. Sols.*, 2018 U.S. Dist. LEXIS 110264, at *6-7 (N.D. Ill. July 2, 2018) ("Because, according to

---

[15]     The facts of this case are practically indistinguishable from the *McGarry* matter, except that the plaintiff in *McGarry* was a creditor of the estate. I observe that plaintiff's counsel in this matter represented the creditor/plaintiff in *McGarry*. Plaintiff's counsel also represented one of Fusari's creditors in this case.

McGarry, the Integrated estate was the direct purchaser, this court held that the estate, through its trustee, was the proper party to bring an antitrust claim.").

Finally, Spinner, as a putative class representative, "cannot rely on the direct purchases of other class members to establish its own standing." *Animal Sci. Prods.*, 34 F. Supp. 3d at 502 (citation omitted). At this stage, Spinner "must establish its own standing, either through its own direct purchases or through the direct purchases of some entity that validly assigned its claims to [Spinner]." *Id.* at 503.

### iii. Analysis

This matter does not involve the typical horizontal price-fixing allegation. In the ordinary case, a product goes through a chain of distribution that includes three key players: the manufacturer; the distributor; and the consumer, who ultimately receives and uses the product. In this case, however, the mechanics of the transaction are as follows.

On June 8, 2015, Gamza, solely in his capacity as the trustee of the Fusari estate, entered into a contract with BMS. (Compl ¶¶50-51; DE 23-1).[16] Gamza, who was identified as the "Client" in the contract, agreed to deposit the funds of the Fusari estate in Rabobank. (Compl ¶51; DE 23-1, at 2, ¶7). The agreement also granted "BMS, Bank, or Financial Institution . . . the right to charge" Gamza's account a "service fee" for combined banking and technology services. (Compl ¶51; DE 23-1, at 2, ¶8). Throughout the agreement, it is clear that BMS's services were being provided directly to Gamza as the trustee.

On that same day, Gamza entered into a Trustee Deposit Agreement with Rabobank, which authorized Rabobank to automatically withdraw a monthly fee from the estate account. (Compl ¶¶52-53; DE 23-2, at 10 ("Rabobank may

---

[16]     Spinner has attached the contract between BMS and Gamza, a Software Licensing Agreement, as an exhibit to its opposition. (DE 23-1). Spinner has also attached the Trustee Deposit Agreement that was executed between Gamza and Rabobank. (DE 23-2). Both documents were referenced in the complaint, and BMS does not dispute the authenticity of the documents. (DRBr at 2-6). They are properly considered on a 12(b)(6) motion. *See* Section II, *supra*.

charge you a fee . . . a portion of which or all of which may be paid to BMS . . . for providing technology services, case management and other banking related services.").[17] BMS was not a party to this separate contract between the bank and Gamza. Prior to the closing of the bankruptcy case, Rabobank deducted $15,627.98 in fees in accordance with the agreements. (Compl ¶¶ 55, 57).

The individual debtor and Spinner as the individual debtor's assignee were not at all involved in the direct exchange of BMS's services for a fee. Based on the mechanics of the transactions, Gamza, as the trustee, negotiated, executed, and was bound by the agreements that governed the use of the product at issue. Gamza executed the Licensing Agreement with BMS, used the software, and arranged for its payment.

Any antitrust violation caused by the alleged price-fixing conspiracy would have ultimately caused injury to the estate, and decreased the amount of assets available for creditors, and ultimately for the debtor. *Cf. McGarry & McGarry, LLC v. Rabobank, N.A.*, 847 F.3d 404, 406 (7th Cir. 2017) (noting that bank fees would be deducted from the creditors' "share of the distribution of the bankrupt's assets."); *see also* 11 U.S.C. § 726 (setting forth order in which property of estate is to be distributed). Additionally, the trustee, who is paid a percentage of funds from the estate, would also be harmed by the alleged antitrust violation.

This matter is unique in that Gamza did not buy the product at issue for his own personal use. He used the product at issue for the benefit of another, the estate. He paid for the product using funds from the estate. And finally, he entered into the contracts governing the transactions at issue solely in his capacity as trustee of the estate.

Therefore, I conclude that the estate is the "direct purchaser," and the trustee, as the representative of the estate, is the proper party to bring this

---

[17] Both the Licensing Agreement and the Trustee Deposit Agreement had anti-assignment clauses, barring Gamza from assigning the agreement without BMS's prior written approval. (DE 23-1, at 3, ¶16; DE 23-2, at 2).

antitrust claim. *See* 11 U.S.C. § 323. The trustee is in a fiduciary relationship with the estate and has a duty to pursue claims on behalf of the estate. The overcharge, to the extent that there was any, was suffered by the estate. To put it another way, the trustee was making the purchase here. The trustee was the party who, but for the alleged restraint on trade, would have negotiated in a competitive market for the best price and terms that could be obtained on behalf of the bankruptcy estate.

That injury was suffered only indirectly by the individual debtor (or the creditors). The individual debtor is no more a "direct purchaser" than were the creditors in *McGarry*.[18] Indeed, the creditors are upstream of the debtor; they are entitled to a distribution, with the debtor receiving only the residue, if any. *See* 11 U.S.C. § 726. To be sure, the amount of assets left in the estate may ultimately be reduced by the amount paid for support services. And the amount left over, in turn, affected the availability of funds for the settlement. That effect, however, is indirect; it is a knock-on consequence of the direct antitrust injury suffered by the trustee (on behalf of the bankruptcy estate).

Spinner is appropriately seen as occupying a position downstream of the estate. Spinner received an assignment from the individual debtor, after the bankruptcy proceeding concluded and the remaining assets of the estate re-vested. Spinner as successor assignee stands in the shoes of the individual debtor. It cannot have greater rights than the debtor did.

BMS's motion to dismiss the complaint for lack of antitrust standing is therefore granted. Because this dismissal is with prejudice, I do not address BMS's remaining arguments.

---

[18] In another filing with this Court, Spinner recognized that the injury is more directly felt by the estate: "The price fixing conspiracy that plaintiff challenges in this action continues to drain many millions of dollars per year out of Chapter 7 bankruptcy estates, to the detriment of creditors across the United States." (DE 28).

## IV.   Conclusion

For the reasons stated above, BMS's motion to dismiss the complaint (DE 15) is granted. Since amendment of the complaint would be futile, this dismissal will be entered with prejudice.

An appropriate order has been filed (DE 51) and remains in effect.

Dated: June 12, 2019

Kevin McNulty
**United States District Judge**